No. 43327.—Petition 5972–R of Portman, Diamond and Schneider (New York).

KINCHELOE, Judge: This is a petition filed under section 489 of the Tariff Act of 1930 praying for the remission of additional duties accruing under that section by reason of the final appraised value of certain so-called dyed Krimmer lambskins imported from Canada and entered at the port of New York exceeding the entered value. The advance in value made by the appraiser represented the Canadian import duty and the Canadian sales and excise tax to which the merchandise in question was subjected and which were not included in petitioners' entered value.

Three witnesses appeared herein on behalf of petitioners. The first witness was the secretary and treasurer of the petitioner corporation who testified that the business of said firm is the manufacture of ladies' wearing apparel; that he purchases all the furs used by his concern in the manufacture of such wear; and that he purchased the skins imported in the shipment under consideration. In connection with the transaction in question, the witness stated that he received a telegram from the Canadian exporter of the instant merchandise advising him of the availability of said merchandise for sale; that he thereupon went to Montreal where he found and inspected a parcel of 10,000 skins being held in bond in the customhouse. The witness further testified that the shipment in question, consisting of 2,289 skins, is part of the 10,000 that he saw when he was in Canada; that the skins covered by the importation in question were shipped with the understanding that if they proved suitable for its purpose, petitioners would buy the remainder; that after receiving said skins they were found to be unsatisfactory and therefore petitioners did not exercise their option for the purchase of the remainder of the lot. The witness further stated that the invoice price is the price actually paid for the merchandise; that said price was the price at which it was held in bond; and that he made no investigation as to the market value for such skins.

In response to questions propounded on cross-examination, said witness testified that neither he nor anyone connected with his firm, so far as he was informed, knew that the instant merchandise had been sent from the United States to Canada; and that he was advised by the Canadian exporter of the instant merchandise, when he was in Canada in connection with the transaction under consideration, that the skins in question came from Russia. The witness further testified that at the time of his inspection in Canada of the instant merchandise he observed that it was stamped "From Russia"; and that he did not know merchandise imported into Canada from Russia was subject to 15 percent duty there, nor that a Canadian sales or excise tax was applicable to said merchandise.

The second witness called on behalf of petitioners was Frank Schneider, the president of said corporation, who stated that his duties with said firm are to handle the financial end of the business and to take care of the office. Said witness testified that this was the first shipment of dyed skins received by his firm from Canada; that previous shipments had always consisted of raw skins; and that, upon receipt of the bill and papers relating to the transaction in question, he immediately transmitted them to his customs broker with instructions to make entry on the basis of the invoice price.

Said witness' testimony with reference to his actions prior to entry of the instant merchandise was, in our opinion, vague and indefinite. Although he testified that he instructed his broker to check up and verify the correctness of the price and the dutiable value of the instant merchandise with the examiner, he said he "didn't know" whether it had been done. He stated that he received communications from his broker but was unable to recall the time or the substance of such communications. When he was shown copies of letters, which were conceded by counsel to have been sent by the broker to the petitioners, said witness was unable to recall the receipt of said letters and denied knowledge of the contents of same. His testimony in that respect is as follows:

Q. Did you receive any requests from the broker to consult the examiner, at any time?—A. I think I received some letters, but I don't remember exactly.
Q. Do you know what the substance of those letters were?
Mr. Carstarphen. I object to the substance of them. I have copies of the letters here. If you care to offer them, you can.

By Mr. Mandell:

Q. Did you, on or about the month of February, receive a communication from the Draeger Shipping Company, a copy of which I will now show you?—A. I don't know. I am not looking the mail over. I didn't look at the mail, and I can't tell whether I received it or not.
Q. Did you receive a similar letter on March 10th?—A. I can't tell. Anything we received is in the file.
Q. And on August 1st?—A. I know we received some from Draeger, but what it was I don't know.
Q. Did you read them?—A. I think I looked over a letter once in which I made an appointment with one of his men to meet him about some extra $200 which the Customs asked.
Q. Did you know what that was for?—A. I don't know.

*       *       *       *       *       *       *

Q. And you did not answer the communications that you received by mail from your broker?—A. Maybe I received them, but I don't know. The only thing that I can tell is when we look into the file, and if it is there, I know.
Q. Don't you remember it?—A. I don't, because I am not always reading the letters. The girl does all the work.

Thereupon, counsel for petitioners offered in evidence the three letters referred to in the above-quoted testimony and said letters were admitted and marked Collective Exhibit 3.

In the first letter, dated February 21, 1939, the broker referred to numerous previous telephone conversations with the petitioners regarding entry of the instant merchandise, and advised petitioners of the advance in value contemplated by the appraiser, and urged said petitioners to amend its entry to meet the values found by the appraiser. The letter of March 21 was a follow-up of the earlier letter and again urged the petitioners to amend their entry to meet the appraiser's value, and concluded as follows:

We cannot see any reason why you neglect to inform us to amend this value and must advise that if we do not hear from you within 24 hours, we shall consider the matter closed.

The third letter dated August 1, 1939, referred to the previous correspondence on the same matter with the advice that the petitioners amend their entry, and "straighten out this matter immediately."

Said witness was further interrogated by both counsel for petitioners and counsel for respondent who attempted to obtain facts material to the issue presented herein, but his testimony, in our judgment, was evasive and indicated either an unwillingness on the part of the witness to give to the court all the pertinent facts relating to the importation and entry of the skins in question, or an unfamiliarity with such facts to an extent that as president of the petitioner corporation and in charge of its office and financial affairs he had not exercised

that degree of diligence and care, so far as the question herein is concerned, which would ordinarily be expected of such an officer of a corporation to ascertain the correct dutiable value of his imported merchandise and make entry thereof accordingly. On the whole, the court was not favorably impressed with the demeanor of said witness. In our judgment, he did not display that frankness in offering his testimony that is so essential in a proceeding of this kind to meet the burden that is cast upon the petitioners by the statute.

The third and last witness called by petitioners was the entry clerk of the firm of customhouse brokers who acted for said petitioners in entering the instant merchandise. He testified that his duties consist of filing entries at the values and in accordance with information furnished to him by other employees or members of said firm; that he made the entry of the skins in question; and that in so doing he overlooked the notations on the invoice, "Sales Tax not included," and "Market Value $3,290." When he was questioned concerning communications by his firm with the petitioners or discussions with the appraiser's office, the witness testified in substance that such matters were outside the scope of his duties, and that they were usually handled by the head of his department or by the liquidator in said firm.

The United States examiner who passed the merchandise in question was the first witness called to testify on behalf of the respondent. He testified in substance that he noticed the statements on the invoice to the effect that the market value of the skins involved in the shipment in question exceeded the invoice price whereupon he called the broker to inform the importer of such fact; that thereafter, and within a week after the entry had come under his observation, he had a conference in his office with a representative of the firm of said customs brokers and Mr. Frank Schneider, the president of the petitioner-corporation; that he was advised by said officer of the petitioner-corporation that the importation in question was part of a lot of 10,000 skins which petitioners expected to buy; that he was shown by said Schneider the petitioners' private or commercial invoice, Exhibit 1 herein, that contained the notation "in bond," which notation immediately put said witness on notice that the instant merchandise was in bond in Canada and the amount shown on the Canadian invoice as the market value included the Canadian duty that would have to be paid by the importer; that he apprised said Schneider of the statement on the invoice that the market value of the merchandise was $3,290; and that he took no further action at that time pending receipt of the remainder of the lot of 10,000 skins. Said witness further testified that he waited a few weeks for the arrival of the remainder of said lot of skins; that they never came; that he then sent notice to the broker to have the entry in question amended by the importer; that he received no reply from said notice; that he sent additional notices at regular intervals of 2 weeks without getting any response; that he finally called the importer's place of business by telephone and spoke to a girl who, "disclaimed any knowledge of the transaction, and said she knew nobody who would know anything about it, and they would call me later." The witness further testified that he called the importer's place of business by telephone "at least twice"; that he withheld his return of value on the instant merchandise "from January 10th, when I first had it on the floor, until some time in July" to permit the importer to amend the entry; and that he finally made his return at the advanced value which was found by the appraiser to be the proper dutiable value of the merchandise. It was further stated by said witness that none of the information he obtained with reference to the importation of the instant merchandise and its dutiable value was volunteered by the petitioners, but that he acquired all of such information from his own analysis of the invoice and entry papers.

For the sole purpose of contradicting certain of the testimony given by petitioners' witnesses, counsel for respondent called as a witness one Thomas B. Connor, a United States customs agent stationed at the port of New York. Said witness testified that he visited the premises of the petitioners; that he talked with Mr. Schneider, the president and one of the witnesses who appeared herein; and that he was told by said officer of the petitioner-corporation that the skins in question "came from Russia to the United States; were shipped from the United States to Canada, and reimported back into the United States."

Counsel for respondent then called as a witness Mr. Sol Portman, secretary and treasurer of the petitioners, who had previously appeared as a witness on behalf of the petitioners. As respondent's witness, he merely testified that he never spoke with anyone in his firm concerning the entry of the instant merchandise; and that he never heard of the three letters, Collective Exhibit 3, hereinabove referred to, which were sent by the broker to his firm.

Section 489 of the Tariff Act of 1930, under which the authority of the court is invoked in the instant case, requires that the petitioners offer *satisfactory evidence* to show that the entry of its merchandise at less value than that found on final appraisement was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise. In our opinion, the proof adduced herein does not meet the demands of said section.

The evidence is strong that the examiner advised both the petitioners and their broker of the discrepancy between the entered value and the proper dutiable value; and that ample opportunity was given to them to amend the entry which they declined to do. Such conduct, in our judgment, reflects indifference, rather than an honest effort to ascertain the correct dutiable value of imported merchandise and to make entry accordingly.

It is our opinion, and we so hold, on the basis of the record before us, that the petitioners have failed to sustain the burden of proof fixed by the statute to obtain relief in the instant case. *Wolf & Co. v. United States*, 13 Ct. Cust. Appls. 589, T. D. 41453, and cases therein cited.

The petition is accordingly denied, and judgment will be rendered accordingly.